## Case No. 7,249.

### The JEANNIE CUSHMAN.

## Case No. 7,250.

### The JEANNIE CUSHMAN.

[3 Ware, 309.] [1]

District Court, D. Maine. Jan., 1865.

Rowe, for libellant.

A. A. Strout, C. P. Stetson, for respondent.

WARE, District Judge. The Wm. Nickels, a hermaphrodite brig of about 120 tons burthen, Ames, master, arrived at Bangor, in the Penobscot river, from Baltimore, Sept.

[1] [Reported by George F. Emery, Esq.]

8th, 1865, laden with white oak timber. The timber was consigned to Mr. Tewksbury, who had a ship-yard opposite to Bangor on the Brewer side of the river. She came to anchor, as alleged in the libel, on the Brewer or eastern side of the stream, about opposite to Tewksbury's ship-yard on the flats, where at low tide there was only five feet of water, as near as she could go to the ship-yard until she was lightened by a partial discharge of her cargo, she then drawing ten feet of water. She was subsequently removed by Atwood, the stevedore employed to unload her, and anchored a little lower in the river, but still on the flats and not in the bed of the river. The unloading commenced on Friday the 8th, and was continued till Saturday evening. At this time, the Jeannie Cushman, from Boston, with a cargo of coal, arrived within three miles of Bangor, where she took a steam-tug to carry her into the harbor. The tug took her in tow and, in coming into the harbor, she came in collision with the Wm. Nickels, and the damage was done that is complained of in this libel.

The first question that arises in this case is, whether the Wm. Nickels was anchored and lay on lawful ground. The harbor regulations of Bangor, established by the city government, and authorized by the legislature of the state, provide that, "no vessel, steamboat, or raft shall be allowed to anchor or lay in the channel of the river, between Bangor bridge and the north line of Hampden, in such a manner as to obstruct the free passage of vessels, boats, or rafts up and down the river or stream." "And if any vessel or raft shall anchor or lie contrary to any of these regulations, the harbor master shall forthwith give notice to the masters thereof, or the person having the care of the same to remove the same; and if the said notice is not complied with without delay, the harbor master shall make or cause the said removal at the expense of the said vessel, boat, or raft."

On the question of the position where the Nickels anchored and lay, there is some variance in the testimony. It has been specially labored on both sides. On the eastern or Brewer side, the land from the shore, at high water, runs off shelving to the bed or channel of the river to a considerable distance. Part of the way the land is bare at low water, and part of it is covered, so that the bed of the river is close to the Bangor side, and the middle of the river is different at different times of the tide. Where the flats terminate they suddenly drop about four feet to the bed of the stream, which is rocky. On these flats and out of the bed of the river, she was placed by Atwood, and remained there, according to the libellants, until the collision, so that she was aground for a considerable time during low tide. Parker, the harbor master, and well acquainted with the river, saw her

on Friday and Saturday, and considered her as lying in a safe and suitable place and did not order her to change her position, and, though he did not go on board of her, could easily determine whether she was in the way or would obstruct the safe navigation of the stream. He thought her in a safe place. His testimony is substantially confirmed by that of Atwood, the stevedore, who unloaded her, by that of Tewksbury, at whose ship-yard she discharged her cargo, and by that of Fifield. To meet and overcome this proof, a large number of witnesses have been examined on the part of the claimants. Without going over all their depositions in detail, it may be remarked generally, that they express their opinion that the Nickels lay in the channel of the river so as to obstruct the navigation of vessels coming into the harbor, and this opinion is formed from her position in the stream. But all agree that the bed of the river is on the Bangor side, and that there are no flats there, but the bed of the river comes up quite to the shore. The tide rises from twelve to seventeen feet, and flows considerably on the eastern shore, but more on the western or Bangor side, so that the centre of the stream will be farther from Bangor at high than at low water. She might be in the middle of the stream at high water and still on the Brewer flats. This testimony I do not think sufficient to overcome the positive testimony on the part of the libellants, of Atwood, who chose her position, and of Parker, the harbor master, who saw her Friday and Saturday, whose business it is to see the channel is kept free from obstructions, and who is very positive that she was placed in a proper manner, from the fact that she lay aground during three hours of low tide, which she would not in the bed of the stream. On a comparison of the whole testimony it is, I think, satisfactorily proved that the Wm. Nickels was on the Brewer flats and in a proper place for unlading. The collision must, therefore, be attributed to the Jeannie Cushman, and she be responsible. There may be, possibly, a question when a sailing vessel is in tow of a steamtug and a collision occurs, whether the tug or the vessel is liable, but it does not arise in this case. The libel is against the vessel, and she is undoubtedly liable, whoever may direct her motions. The maritime law treats her as a person, and makes her answerable for all the damage she does. U. S. v. The Malek Adhel, 1 How. [42 U. S.] 233, 234.

The collision took place between eleven and twelve o'clock at night. The crew of the Nickels had part of them left her, so that. at that time she had but two men in addition to the captain. These were all abed, but a light was suspended several feet above the deck. and it was a moonlight night, the moon being two hours or more high, and clear starlight or only thin flying clouds. The Cushman, in ascending the river on the Bangor side, struck a scow and glanced from that against the starboard bow of the Nickels, and, in the collision, the two masts of the Nickels were broken and fell overboard, and some damage was done to her rigging. She was repaired at Tewksbury's wharf, and the bills are all rendered in and not objected to. Her repairs are taxed at ordinary prices. and have been paid to the amount of $630.55.

In collision cases the injured vessel is entitled to be put in as good a condition as she was in before the injury, and no allowance, as in insurance cases where new materials are used. is made for new instead of old. But, in this case, as the foremast, where it was broken. had been spliced, was old and evidently weak and rotten at that place, I think it proper that this should be deducted. and as the cost of both masts was $95, from this is deducted $47.50. The libellant also claims for demurrage while the vessel was under repair. On this subject the practice of the courts is curious; in some cases it is allowed and in others not. No certain and uniform rule is established. But it seems, in the present case. some allowance should be made, and is. I allow $62 to be added for this. Decree for libellant for $645.05, damages and costs.

This case was carried by appeal to the circuit court, where the decree of the district court was affirmed, September 3, 1866. [Case No. 7,249.]